CASE 77—PETITION EQUITY—December 19.

# Hardin County, &c., v. Louisville & Nashville Railroad Company.

### APPEAL FROM LOUISVILLE CHANCERY COURT.

1. SUBSCRIPTION BY COUNTY TO STOCK OF RAILROAD COMPANY—INTEREST ON STOCK—STOCK DIVIDEND.—Under the charter of a railroad company which authorized counties to subscribe for stock, and provided that the company should allow to all holders of stock "interest on the same from the time of paying for said stock up to the time of making the first dividend, and issue to the holder stock therefor," the railroad company, by declaring a *stock* dividend of one-fourth of one per cent., did not acquire the right to stop the running of interest on stock subscribed and held by a county. The "dividend" intended by the charter provision was a *cash* dividend.

2. SAME—ESTOPPEL.—The fact that one of several sinking-fund commissioners of a county holding stock was present at a meeting of stockholders of the railroad company, at which they adopted a resolution recommending that, in order to prevent the further accumulation of interest stock, a dividend of one-fourth of one per cent. payable in stock be made, did not bind the county by that recommendation. But even assuming that the county was fully represented at that meeting, that recommendation to the board of directors does not estop the county from claiming that the declaring of the stock dividend did not stop the running of interest.

3. SAME.—The right of one of several counties which had subscribed for stock was not affected or impaired by the acquiescence of other counties in the mode adopted by the board of directors for adjusting the stock and interest accounts.

4. SAME.—As a county subscribing for stock did not become holder of the stock until delivery and acceptance of the bonds in payment of it, the date of that transaction, rather than date of the bonds, should be treated as the time interest on the stock commenced.

W. P. D. BUSH FOR APPELLANT.

1. The charter of the railroad company required that the first dividend which the president and directors of the company should make in compliance with the provisions thereof, and in compliance with the contract made in 1852 between the county and the railroad company, should be a *cash dividend*. Therefore, the accruing of interest on the stock subscribed and paid for by the county was not stopped by the making of the one-fourth per cent. *stock dividend* of April 1, 1861.

Hardin County, &c., v. Louisville & Nashville Railroad Company.

The charter of the railroad company did not confer any power to declare a *stock dividend*. Corporations have only such powers as are granted affirmatively or by necessary implication. (Morawetz on Private Corporations, sec. 149; Rorer on Railroads, p. 33, sec. 8.)

2. The stock was paid for January 1st, and the county was entitled to interest from that date instead of from April 1st.

3. The facts alleged by the railroad company in its answer do not constitute an estoppel. (Bigelow on Estoppel, p. 480.)

Every fact necessary to constitute an estoppel must be pleaded. (Bigelow on Estoppel, pp. 480, 606–618; Herman's Law of Estoppel, sec. 606; Faris v. Dunn, 7 Bush, 287.)

There can be no estoppel in any case without both deceit and injury. (Lasley v. Lackey, 4 Ky. Law Rep., 897; 3 Bush, 49; 6 Bush, 529; Story's Equity, sec. 1543.)

4. Samuels, the alleged representative of Hardin county in the stockholders' meeting of October 7, 1861, did no act and had no power to do any act in said meeting whereby the county could be estopped from asserting its contract right.

If the acts of an agent are relied on they must be within the scope of his authority, and the authority must be shown. (1 Met., 550; Mt. Sterling & J. T. P. R. Co. v. Looney, 7 Cranch, 305.)

5. The stockholders' meeting of October 7, 1861, had no power to authorize the president and directors to declare a stock dividend, or to limit or extend the legal effect of any stock dividend they might thereafter declare under the act of May 16, 1861.

As to the power of the majority of the stockholders of a corporation, or of the majority present at a stockholders' meeting, see Morawetz on Corporations, secs. 149, 354, 355, 368; Thomas v. Railroad Co., 101 U. S., 71; Railway Co. v. Allerton, 18 Wall., 235; Maddox v. Graham & Knox, 2 Met.; Hoyt v. Thompson's Ex'r, 19 N.Y., 216.

6. A contract which is *ultra vires* originally can not be ratified or confirmed by any subsequent act of the same party. (Cook v. Tullis, 18 Wall., 338; 2 Rorer on Railroads, p. 943; Angell & Ames on Corporations, secs. 291, 297.)

7. The president and directors had no right to change the contract between Hardin county and the railroad company. (Wheeler v. New Brunswick, &c., R. Co., 115 U. S., 34.)

8. In the absence of any allegation of facts showing that the railroad company was misled to its injury, there could not be any estoppel against the county by its mere silence or acquiescence. (Railroad Co. v. Dubois, 12 Wall., 64; Ketchum v. Duncan, 966 U. S., 666; C. & L. R. Co. v. Bowler, 9 Bush, 468.)

## J. P. HOBSON ON SAME SIDE.

1. The charter of the railroad company was a contract between the county and the company whereby the county was to have interest on its stock

until a dividend was declared. This dividend is defined in the charter as a *money* dividend, and this charter definition is a part of the contract. The court must look to the whole instrument for its proper interpretation. (Morawetz on Corporations, sec. 149; 2 Parsons on Contracts, 499–502.)

2. At the time the stock dividend was declared the company had applied all its capital and credit to the construction of the road, and relied on the net earnings to pay the interest and floating debt. To divide earnings among stockholders under such circumstances would be bad faith to creditors, and any court would have enjoined it. (St. John v. Erie Railroad Co., 22 Wall., 136; Freeman's note to Goodwin v. Handy, 99 Am. Dec., 762; Morawetz on Corporations, sec. 346; L. L. F. & M. Ins. Co. v. Page, &c., 17 B. M., 412; Gratz v. Redd, 4 B. M., 178.)

3. Samuels was one of three commissioners, and a majority only had power to act. (1 Rev. Stat., p. 360, sec. 3.)

The stock was real estate (Copeland v. Copeland, 7 Bush, 349), and a written authority to Samuels must be shown.

4. The county commissioners, having no right to sell or release the stock, had no right to release the interest on the stock; and therefore the county is not estopped by their acts so as to be barred of relief here, for this would be to allow them to do by indirection what they could not do directly. (Pearce v. Railroad Company, 22 How., 441.)

The county commissioners are under the charter a *quasi* corporation aggregate (Connell v. Woodward, 37 Am. Dec., 173), with distinctly defined powers, and a person who deals with a corporation must at his peril take notice of its charter or articles of association. (Morawetz on Corporations, sec. 64; Davis v. Old Colony Railroad, 131 Mass., 258; s. c., 41 Am. Rep., 221; Thomas v. West, Jersey R. Co., 101 U. S., 71.)

5. The commissioners, under the charter, are public officers (Commonwealth v. Pritchett, 11 Bush, 277; Shelby v. Alcorn, 72 Am. Dec., 169, and note 179–189); and persons dealing with them must take notice of the extent of authority conferred upon them by law. (Lee v. Monroe, &c., 7 Cranch, 368.)

But if they are regarded merely as municipal agents the result is the same. (Dillon on Mun. Corp., sec. 372; McDonald v. Mayor, 68 N.Y., 23; Murphy v. Louisville, 9 Bush, 189.)

6. The defense of laches can not be maintained. An estoppel in equity never arises where the opposite party knew the facts and was not in fact misled (2 Story's Equity, sec. 1537), or if by reasonable diligence he could have learned them. (2 Pomeroy's Equity, sec. 810; Brandt v. Va. C. & I. Co., 3 Otto, 326; Carter v. Champion, 8 Conn., 549; s. c. 21 Am. Dec., 695; Bigelow v. Tapliff, 25 Vt., 273; s. c. 60 Am. Dec., 264; Odlin v. Gore, 41 N. H., 477; Fisher v. Mossman, 11 Ohio St., 42; Hill v. Epley, 7 Casey, 331; Bales v. Perry, 51 Mo., 449.)

Hardin County, &c., v. Louisville & Nashville Railroad Company.

Nor can there be any estoppel in equity unless the party has been induced to change his position by the conduct of the other party and will be injured if the estoppel be not applied. (2 Pomeroy's Equity, secs. 812, 813.)

7. The purpose of the action is not to interfere with the stock issued as a dividend in April, 1862, but to settle the account between appellant and appellee, and therefore the mere acquiescence of appellant is unimportant. (Wood on Limitation, p. 126; C. & L. R. Co. v. Bowler, 9 Bush, 468; Clark v. Hart, 6 House of Lords Cases, 632.)

Even in cases involving purely equitable rights, if no statute bars the analogous case at law, there is no bar in equity. (Stackhouse v. Barnstow, 10 Ves., 446; Perlins v. Cartmell, 4 Harr., 270; Allore v. Jewell, 4 Otto, 506.)

8. The other stockholders well knew the rights of Hardin county, and, waiving their rights, or settling with full knowledge of these rights, they have no standing in court to insist that this action of theirs shall prejudice Hardin county. (Barlow v. Bell, 1 A. K. Mar., 246; s. c., 10 Am. Dec., 831; Petty v. Roberts, 7 Bush, 418; Davis v. Old Colony Railroad, 131 Mass., 258; s. c., 41 Am. Rep., 221, and cases cited.)

9. If a majority of the stockholders, in their regular annual meeting, had adopted a resolution expressly agreeing to stop interest, and thus reduce the stock, their action would have been void. (Sutherland v. Olcott, 95 N.Y., 93.)

The acquiescence of a stockholder in such a change can neither give validity to the stock nor bind him or the corporation. (Scoville v. Thayer, 105 U. S., 143.)

WINTERSMITH & COFER, JOHN MASON BROWN, P. B. MUIR, OF COUNSEL ON SAME SIDE.

WILLIAM LINDSAY AND RUSSELL HOUSTON FOR APPELLEE.

1. Dividends of stock may be issued where there are net earnings properly applicable for the purposes of a cash dividend, if it be expedient to retain the amount in order to make permanent improvements. (Pierce on Railways, p. 123; Morawetz on Private Corporations, secs. 348, 349; Wood on Railways, vol. 1, sec. 72.)

In October, 1861, when the dividend in question was recommended, the net profits of the operations of the railway were sufficient to have made and paid a dividend of over four per centum.

2. As against the counties the tax-receipt stockholders were entitled to have the accumulation of interest-stock stopped. A court of equity would as the case then stood, at the instance of these stockholders, have interposed to compel the declaration of a dividend and the stoppage of interest upon the more favored stock. (Thompson v. Erie R. Co., 45 N. Y., 468; Harris v. Refining Co., 41 Cal., 393; Pierce on Railways, 122; Morawetz on Corporations, sec. 404.)

3. The power of the county commissioners was not restricted to voting .
   for directors.   Such was the understanding of the stockholders of the
   railroad company, including Hardin county, and this understanding
   was in harmony with the universal understanding and custom in this
   country.   (Warner v. Mower, 11 Vt., 385;  Gratz v. Redd., 4 B. M.,
   185.)
4. The failure of the county to sue promptly upon its determination to
   repudiate the action of its representatives estops it now to sue.  (Kent
   v. Quicksilver Mining Co., 78 N.Y., 159;  2 Redfield's Law of Rail-
   ways, 356;  2 Story's Equity, sec. 1546;  Perry on Trusts, sec. 870;
   Bigelow on Estoppel, p. 508;  Herman on Estoppel and *Res Judicata,*
   vol. 2, sec. 1186.)

I. & J. CALDWELL of counsel on same side.

JUDGE LEWIS delivered the opinion of the court.

The Louisville & Nashville Railroad Company was, in
1850, by statute of this State, incorporated for the pur-
pose of building a railroad from Louisville to Nashville,
provision being made in the charter and acts amending
it for subscription of stock by cities, towns, and counties
into or through which the road extended, as well as by
individuals; and in pursuance thereof, Hardin county,
by its county court, subscribed thirty thousand shares,
equivalent to $300,000, in payment of which county bonds
for that amount, having interest coupons attached, were
issued, payable in twenty years, one-third of them being
dated January 1st of each of the years 1853–4–5.   Sec-
tion 5 of an amendment to the charter, enacted March
20, 1851, is as follows:  " Said company shall allow to
all subscribers and holders of stock under the company
interest on the same from the time of paying for said
stock up to the time of making the first dividend, and
issue to the holder stock therefor;  and when stock shall
be subscribed for a branch, they may provide that said
stock shall not be entitled to draw dividends until said
branch is completed, but may allow interest on the pay-

ments up to the completion thereof, and pay it in stock."

October 8, 1861, the board of directors of the company, by resolution, declared a dividend of a quarter of one per cent., payable in stock as of January 1, 1862, and provided that "interest on the stock of the city of Louisville, the several counties and individuals, be calculated to April 1, 1862, and stock issued for the same and for said dividends as well as for the original certificates of stock on the surrender thereof;" the amount of stock dividend going to Hardin county under the resolution being $720.

No dividend, either cash or stock, had before that time been declared, nor was any afterward until January 2, 1864, when there was another stock dividend of ten per cent., followed by a cash dividend of six per cent., which was declared June 24 and made payable June 30, 1864. But the interest provided for by the section quoted was not allowed by the company to continue on the stock of any city, county or individual after April 1, 1862; the ten per cent. stock dividend and the six per cent. cash dividend just mentioned, as well as all subsequent ones, whether cash or stock, being declared and paid to each holder according to his or its aggregate of stock, and interest up to April 1, 1862, added.

This action was brought March 19, 1869, for judgment requiring the company to issue to Hardin county additional stock equal to amount of interest on the sum of $300,000 from April 1, 1862, when it was stopped by the board of directors, to June 30, 1864, when the first cash dividend was declared, less amount of the fractional dividend mentioned, and also for the additional dividends

the county was entitled to on that basis, but withheld by the company.

The judgment of the lower court dismissing the action was affirmed by this court in 1878, but a rehearing was granted and reargument ordered, which, however, did not take place until 1885, and decision of the case has been further delayed several years awaiting briefs of counsel.

As will be readily seen, the main question in the case is whether the stock dividend of a fourth of one per cent., declared April 1, 1862, was such compliance with section 5 of the act of March 20, 1851, as authorized or justified the board of directors to stop running of interest on the stock therein mentioned. It is manifest, and in defendant's answer admitted, that Hardin county was in the meaning of that section holder of stock to the amount of $300,000, and entitled to interest on it payable in stock of the company. But an incidental question is made by counsel, which we will now dispose of, as to the time that interest began, whether January 1st or April 1st of the respective years the bonds were issued. As the county did not become holder of the stock until delivery and acceptance of the bonds in payment of it, the date of that transaction, rather than date of the bonds, should be treated as the time interest on the stock commenced. And in absence of evidence of the precise date of such delivery and acceptance, it may be fairly presumed April 1st was the time, because that date and October 1st of each year were fixed for payment of semi-annual interest on the bonds.

It is evident that subscription of stock by the city of Louisville and counties through which the road would pass was chiefly relied on by the company, and without

such aid the enterprise would not have been carried out, if ever undertaken; for of the sum of $2,535,707.60, amount of stock subscribed and paid for up to April 1, 1862, only $135,706.60 was private subscription. It must be, therefore, presumed that the terms and conditions of such corporate subscription of stock were intended to be such as to make as easy as possible the heavy burden of taxation imposed upon each county, and at the same time so explicit and obligatory they could not be misconstrued or evaded by either party to the contract.

The only character of dividend mentioned in any of the acts passed previous to the subscription of stock and issue of bonds by Hardin county, or that the board of directors had the authority to make, is that referred to and described in section 19 of the charter, approved March 5, 1850, as follows: "That said president and directors shall annually or semi-annually declare and make such dividends as they may deem proper of the net profits arising from the resources of said company, after deducting the necessary current and probable contingent expenses, and that they shall divide the same among the stockholders of said company in proportion to their respective shares." And it seems to us it would be hard to find language that more accurately and fully describes a cash dividend, or more certainly and completely excludes the idea of a stock dividend, than is done by that there used. Moreover, to terminate interest on the stock whenever the board of directors of the company might choose to declare a mere stock dividend, however insignificant, would have been utterly inconsistent with the plainly expressed terms upon which county subscriptions were made, as well as subversive of the plan distinctly

provided in the various acts for meeting principal and interest of the bonds.

By section 7 of the act of January 9, 1852, it is in substance provided that in any case of a county subscribing to the capital stock of the company and issuing bonds to pay therefor, and until the dividends on the stock subscribed shall be sufficient to pay interest on said bonds, the county court shall levy a tax on the property of the county sufficient to pay such interest.

Section 12, same act, provides that all dividends received upon the stock held and owned by any county shall be sacredly set apart as a sinking fund, to be only used for payment of the principal and interest of the bonds.

Section 13 provides for levying a direct tax to redeem the bonds in case the dividends on the stock held by a county shall not be sufficient to enable the county to redeem them at maturity by means of the sinking fund.

Section 14 provides that in case a direct tax is levied to redeem the bonds at maturity, the commissioners of the sinking fund shall cause transferred to the order of the tax-payers the stock held by the county, upon delivery to said commissioners of the receipts of the holders thereof of an amount equal to one share of stock.

Section 15 provides that upon the date of the first dividend and thereafter, upon presentation and surrender at the office of the company of receipts for taxes paid to defray interest on the bonds given by any county, the company shall issue to the holders thereof stock for the same.

But that section was so amended by section 14 of the act of January 17, 1856, that any tax-payer might there-

after, even before the date of the first dividend mentioned in section 15 of the act of 1852, present his tax-receipts to the county commissioner appointed for the purpose, and obtain a certificate setting forth the number of shares and fractions of shares to which the holder is entitled, and upon presentation of such certificate obtain from the railroad company certificates of stock in shares and fractions of shares; and it was provided that he should be entitled to all the rights and privileges of a stockholder, *but that such stock should not bear interest.*

It is plain that the various county subscriptions were made upon the faith and agreement of the company that the stock paid for with interest-bearing bonds should bear interest payable in stock until a cash dividend was declared with which to remove or lessen the burden of taxation; for we have not discovered a single provision in the charter or amendments that authorized the board of directors to stop the interest in any other event or upon any other condition.

The act which it is contended conferred the authority was passed May 16, 1861, and is as follows: " That the Louisville & Nashville Railroad Company is authorized to withdraw by purchase fractional shares of stock and interest scrip, and to sell fractions to make full shares; and is also authorized to increase the capital stock of said company to an amount sufficient to represent the full cost of the road and branches in stock; also to liquidate any of the mortgage or other debts of the company by the issue of preferred stock, entitling the holder to dividends at the rate of four per cent. half-yearly on such stock."

But in our opinion that act does not repeal, nor is it

at all repugnant to, section 5 of the act of 1851; for it does not in any manner relate to the subject of interest on stock previously subscribed and paid for. It is true the capital stock of the company is thereby authorized to be increased to an amount sufficient to represent the full cost of the road, but that might have been done without at all impairing the rights of counties already secured by contract with the company. ·

Nor do we think the resolution of the board of directors of October 8, 1861, already mentioned, to declare a dividend of one-quarter of one per cent. in stock, had necessarily or properly the effect to stop interest on stock which the company had agreed to pay, though it may have been covertly so intended. It is true provision was then made "that interest on stock of the city of Louisville, the several counties and individuals, be calculated up to April 1, 1862, and stock issued for the same." But even if intention of the directors to thus summarily put an end to contract rights could be fairly implied from the language used, still, in the absence of definite and express terms, an effect that would render it illegal should not be given to the resolution, especially as it may be construed so as to be consistent with the statutes.

It does, however, appear that May 27, 1862, the president of the company sent to the county court or commissioners of the sinking fund of Hardin county a statement of the stock dividend of one-fourth of one per cent. and a proposed agreement, to be signed by them, for settlement of the county's stock account by stopping the interest at April 1, 1862; but that proposition was declined. And there does not seem to have been any further official action taken or direct notice given to Hardin county of

the purpose to stop interest on the stock until January, 1864, when the stock dividend was made and declared on that basis, as was also the cash dividend of June 30, 1864.

According to the agreed facts in this case the amount of tax-receipts converted by the tax-payers of Hardin county, or by those to whom they had been sold and transferred, into certificates of stock prior to April 1, 1862, was the sum of $174,419.25; and the amount so converted between that date and June 30, 1864, was the sum of $40,300.84. But though, according to the charter and amendments, such stock certificates were as they accumulated, and at the first and each subsequent making and declaring cash dividends, to be deducted from, and to that extent lessen, dividends on amount of stock originally issued to the county, they were not, as expressly provided by the act of 1856, to bear interest. It will thus be seen that as a result of the action of the board of directors the stock of Hardin county was on June 30, 1864, reduced not only to the extent of the entire accumulation of stock certificates up to that date, and dividends thereon ratably lessened, but still further reduced to the extent of interest thereon from April 1, 1862, up to that date, which should have been added to the principal sum, but was withheld.

It is contended, however, the county was not prejudiced thereby, because what was lost in interest was gained by the tax-payers. That position is not entirely correct, and if it was would not excuse violation of a right plainly given by the statutes under which the subscription of stock was made and accepted. But it is not a reasonable assumption that the stock certificates were

at the time held wholly by tax-payers of the county; on the contrary, common observation teaches that tax-receipts usually find their way into possession of speculators, who are, not seldom, directors of the company having the best knowledge of their real value, as well as power to regulate and control it. Besides, even if the holders of such certificates had been altogether tax-payers of the county, the gain to them would not have been any thing like full compensation for the loss to the county of the interest on the original subscription from April 1, 1862, to June 30, 1864. For the county bonds were not due in 1862, and the loss of interest after that date to that extent lessened the fund set apart as required by statute and intended to meet the principal, and thus injured both the county and those required to pay subsequent taxes. But there is no issue in this case between Hardin county and tax-payers thereof, but the simple question is as to the legal right of the county to the interest on the stock, which was withheld, as we think, arbitrarily and illegally.

The plaintiff is therefore entitled to the relief sought, unless some one of the grounds relied on is an available defense.

It appears that October 8, 1861, a committee appointed at a previous meeting made a report to the stockholders recommending that in order to prevent the further accumulation of interest stock after April 1, 1862, a dividend of one-fourth of one per cent. payable in stock be made, and the fact that one of the sinking-fund commissioners of Hardin county was present when the stockholders by vote approved and adopted that recommendation of the committee is pleaded and relied on as an estoppel. The

action of that single commissioner is not shown to have been authorized either by the Hardin county court or by the other two commissioners, and can not be regarded as binding on the county, especially as it was utterly without any statutory sanction, and in fact in the teeth of the statutes. Besides, the action of the stockholders, even assuming Hardin county was fully represented in the meeting, was no more than a mere recommendation to the board of directors; and even the resolution the board adopted properly construed, as already indicated, did not amount to stopping the interest. So far from doing any act by its county court, or a majority of sinking-fund commissioners, amounting to an estoppel, the first distinct and authoritative proposition to stop the running of interest, made by the president of the board of directors in 1862, was declined, and October, 1864, the county court adopted resolutions protesting against it. And it is agreed that various conferences of agents and attorneys of the county and officers of the company took place between that time and the commencement of this action with a view to compromise the dispute as to interest on the stock for the period mentioned, which proved abortive. It seems to us that neither the defense of limitation nor estoppel can avail. Nor do we think the acquiescence of other counties in the mode adopted by the board of directors for adjusting the stock and interest accounts can affect or impair the right of Hardin county, which is distinct and independent; for they need not have been, nor is there the slightest evidence they were, misled or deceived by the conduct of Hardin county or its officials.

It is contended the company had sufficient resources

in April, 1862, to justify declaring a cash dividend; and that as it was thought expedient by the board of directors, and was to the true interest of all stockholders, counties as well as individuals, to use the money to pay off debts of the company and better condition of the corporate property, it would be now inequitable to grant the relief prayed for. We think there is enough in this record to clearly show the condition of the company was not such as to authorize a cash dividend in 1861 or 1862, and that it would have been improper for the directors to have declared any. It is sufficient as to this case they did not do so, and consequently the event or condition did not then occur upon which alone the interest on the stock of Hardin county could be stopped; and it having been illegally and to the injury of the county done, it is now entitled to the relief asked, which consists in issuing to it stock as of June 30, 1864, in amount equal to the interest on $300,000 from April 1, 1862, to that date, and payment of such additional dividends as the county was entitled to on that basis, and interest on the amounts from the several dates upon which they ought to have been paid but were withheld.

The judgment is reversed and cause remanded for proceedings consistent with this opinion.